Filed 7/19/16  In re P.N. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re P.N., a Person Coming Under the Juvenile Court Law. | B261201 (Los Angeles County Super. Ct. No. DK01715) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>Z.N.,<br><br>     Defendant and Appellant;<br><br>S.N.,<br><br>     Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony A. Trendacosta, Judge.  Reversed.

Lori A. Fields, under appointment by the Court of Appeal; Law Offices of Cynthia A. dePetris and Cynthia A. dePetris for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Respondent.

_____

Mother, through an informal "walk on" petition, sought to modify father's custody rights regarding their infant daughter, P.N. (the Child). The juvenile court construed mother's petition as a request made pursuant to section 388 of the Welfare and Institutions Code.[1] Section 388 gives the court two ultimate choices: "(1) summarily deny the petition or (2) hold a hearing." (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) The court continued the section 388 petition, because the mother had not properly authenticated her supporting documentation. However, the court, apparently finding some potential merit in mother's petition, also "temporarily" but significantly modified custody of the Child. Before mother's section 388 petition, the parents cared for the Child at their respective homes, alternating every two days, with no monitoring. Under its "temporary" order, the court limited father's custody of the Child to monitored visits, three times a week for just two hours each.

When mother's section 388 petition came before the juvenile court following the continuance, the court stated that it was not going to "even engage in argument on the issue." Instead, the juvenile court terminated jurisdiction but left its temporary order in place; it did so, so that mother could go to family court, where the parents were litigating their divorce, and request a "modification of whatever visitation or custody orders she deems appropriate based upon the evidence that she wishes to present." In effect, the court both summarily denied mother's section 388 petition by terminating jurisdiction without ever hearing argument or receiving evidence on the petition *and* granted it by leaving its temporary order modifying father's custody in effect, but it did so without ever holding a hearing on the petition—that is, without ever allowing father to present evidence showing why his custody and visitation rights should not be modified. The

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

juvenile court took this unusual approach because it believed that, with the Child no longer in danger, the family court was the better forum for the parents to address issues of custody and visitation.

When father moved for reconsideration, he requested that custody and visitation be restored to the status quo ante. Notably, the court acknowledged that its temporary order was "improper" because it had been made without giving father a hearing. Nevertheless, instead of restoring the status quo ante and then terminating jurisdiction, the court, again without giving father an evidentiary hearing, issued a new "interim" order restricting father's custody and visitation to two days a week (Tuesdays and Thursdays) from noon until 6:00 p.m. This new "interim" order would remain in effect until the family court could address mother's request for a change in custody/visitation.

As discussed in more detail below, we hold that the juvenile court abused its discretion with respect to its temporary and interim orders modifying father's custody and visitation and that such an error was not harmless.

## BACKGROUND

### I.     The juvenile court acquires jurisdiction over the Child for safety reasons

Mother and father married in March 2012. In August 2013, mother gave birth to the Child. In mid-September 2013, a month after the Child's birth, mother was hospitalized for approximately one week due to psychiatric issues, including post-partum depression and having suicidal ideations. On or about September 22, 2013, a violent confrontation occurred between mother and father, in which mother brandished a knife and scissors at father while she held the Child under her arms and squeezed the Child's head with her elbows (the Incident). The police came and mother voluntarily allowed herself to be hospitalized.[2]

---

[2] The police did not file any charges or make any referrals to Los Angeles Department of Children and Family Services (DCFS) arising out of the Incident. DCFS became involved when the hospital referred the family to DCFS in order to check on father's ability to care for the Child.

On October 9, 2013, DCFS filed a juvenile dependency petition alleging that the Child came within section 300, subdivisions (a) and (b) as a result of the Incident.[3] At the detention hearing on that same day, the court ordered, among other things, that the minor be detained from mother and released to father. In addition, based on DCFS's recommendations, the court ordered DCFS to develop a safety plan and a specific schedule for mother's visits and specified that her visits were to occur at least three to four times a week.

## II. DCFS observes progress with regard to the Child's safety

Over the course of the next several months, DCFS filed a number of reports documenting an increasingly stable situation with respect to the Child's safety and well-being. For example, in a report dated November 12, 2013, DCFS recommended to the court that it have discretion to liberalize mother's visits upon her completion of an intensive counseling program. Mother was fully compliant with the counseling program and had made "significant progress toward recovery" and mother was willing to participate in court ordered services, and the maternal grandparents were willing to supervise mother's time with the Child. The court subsequently adopted DCFS's recommendation.

In a report signed on December 13, 2013,[4] which was prepared in anticipation of a disposition hearing, DCFS found that "[b]oth parents appear to be providing good quality parenting." DCFS further found that mother had stabilized and was able to provide full-time care to the minor. DCFS opined that it was in the Child's "best interest" to have "continuity and be with her mother, her parent for bonding and attachment," rather than

---

[3] On September 27, 2013, father filed a petition in family court to annul the marriage due to it being based on mother's "unsound mind." Father identified the date of separation as September 22, 2013, the date of mother's hospitalization following the Incident. As a consequence, concurrent with the proceedings in juvenile court, there were proceedings in the family court.

[4] At this time, on weekdays, the Child resided with father in the evenings and lived with mother daily from 8:00 a.m. to 6:00 p.m., and the parents split custody on alternate weekends.

4

with father, who had to obtain childcare while he worked. Specifically, DCFS recommended that mother have three days of unmonitored visitation with the Child once the restraining order filed by father in the immediate wake of the Incident was removed.

In a supplemental report signed on February 7, 2014, DCFS noted that "[d]uring the past five months no new Emergency Response Referral[s] . . . have been assigned to this family." DCFS further noted that, during that same period, mother "has demonstrated that she has the cognitive, physical, and emotional capacity to care for her child" and she has experienced no new mental health crises. In short, mother had "regain[ed] stability." According to DCFS, "[i]t is reasonable to state that both parents are aware and committed to meeting the needs of their child." DCFS, however, also noted that due to a "high level of resentment and animosity" from mother's parents, DCFS was "placed in a position of having to mediate communication and visitation."

**III.    As concerns over safety recede, the juvenile court becomes increasingly involved in custody and visitation issues**

The parents' inability to agree on custody and visitation issues was made plain to the juvenile court in February 2014. At a contested adjudication hearing on February 19, 2014, the court sustained DCFS's amended petition. At that same hearing, the court ordered the parents to work out a shared overnight visitation schedule based on agreements reached during the hearing. The parents, however, proved unable to agree on mother's visitation schedule; as a result, on February 25, 2014, the court ordered them to alternate caring for the Child every two days. Due to the level of conflict between the parents, the court ordered the parents to have no physical contact except when they exchanged the Child.

On March 19, 2014, at the dispositional hearing, the court declared the Child a dependent of the court and placed her in the custody of both parents under a home of parent order. The court continued the previous "exchange plan" with alternating custody every two days (the dispositional order). The court further ordered the parents and their attorneys to work out a mutually-agreed halfway point between their two homes to exchange the Child.

5

**IV.    Mother seeks to restrict father's custody and visitation**

In the spring and summer of 2014, in response, inter alia, to an alleged incident of "road rage" involving father in one car with the Child and mother's parents in two separate cars, mother filed two different section 388 petitions.

*A.    Mother's first section 388 petition*

On June 18, 2014, mother filed a section 388 petition seeking to modify the dispositional order (the first section 388 petition). Specifically, mother requested, inter alia, that the court order monitored visitation for father, order him to participate in a psychological evaluation and in individual counseling, and be prohibited from transporting the minor in his car. On that same day, the juvenile court set mother's first section 388 petition for an evidentiary hearing on July 30, 2014. Due to an ongoing police investigation into the alleged road rage incident and a hearing on the maternal grandfather's request for a restraining order against father scheduled to occur on July 1, 2014, the court stated that it was "premature for the court to do anything proactively" at that point. However, the court expressed its hope to get the results of those things in order for it to "make a decent decision" on mother's first section 388 petition. The court also noted that it is "a court of limited jurisdiction. And when we . . . establish the [C]hild is safe our job is done. With respect to the ongoing family law issues, those will be litigated in another court and should be."

In a report filed on July 30, 2014, DCFS evaluated the alleged road rage incident and the other grounds identified in the first section 388 petition as grounds for modifying father's custody and visitation rights. DCFS, after reviewing all of the relevant documentation and after speaking with father's friend who was a witness to the alleged road rage incident, found "no evidence" of "child abuse and neglect" by father. DCFS opined that the alleged conduct did not require removing custody from father or restricting his ability to transport the Child in his car, unless father was convicted of

6

reckless driving or driving under influence. DCFS further found that a number of the issues raised by the first section 388 petition were "family law issue[s]."[5]

On July 30, 2014, at the hearing on the first section 388 petition, the court informed the parties that it would not be "taking testimony because everything—this is a motion, everything should be in the supporting paperwork that was submitted by [mother's counsel], but that the court does have discretion based upon any representations or arguments made." The court, however, did offer to allow either party to cross-examine the social worker who had prepared DCFS's report on the first section 388 petition. Neither party objected to the court's decision to rule based on the papers submitted by the parties; and neither party elected to cross-examine DCFS's social worker. The court further informed the parties that mother's request that father's visitation be monitored required a finding by clear and convincing evidence that there was a substantial risk of detriment that required the court to modify father's access to the minor. The court denied the petition, stating that it did not believe the evidence was sufficient to support modifying father's custodial rights. The court stated that although its main concern was the minor's welfare, it could not "find a risk to the child today."

Once again, the court noted that it was dealing with issues that "overlay" those being "litigated in the family court." The court then reminded the parties that the law is "fairly clear that dependency court is not a forum to litigate family law issues."

On August 25, 2014, DCFS reported that the Child appears to be "well-adjusted" and has a "healthy attachment and bond with both her parents." DCFS further reported that "there have been no . . . physical child safety concerns in either home[]."

B.      *Mother's second section 388 petition*

On September 29, 2014, mother filed a walk-on request that asked the juvenile court, inter alia, to reduce father's contact with the Child based on a finding in the family

---

[5] The family law issues raised by the first section 388 petition, according to DCFS, were timeliness for child custody exchanges, child support, and the return of mother's service dog.

court that father had committed an act of road rage against the Child's maternal grandparents and based on the issuance of a restraining order by the family court protecting the maternal grandparents (the second section 388 petition).

The court found that the documentation attached to the second section 388 petition—copies of a restraining order and a reporter's partial transcript of a proceeding before the family court on September 3, 2014—"did establish . . . a number of troubling and concerning issues." However, the court noted that those documents were not properly authenticated and, as a result, the court could not rely upon them. Accordingly, the court continued the matter to October 14, 2014. In the interim, and based on its "general powers to make orders which, in the court's view, are in the best interest and for the safety and protection of the child," the court temporarily but significantly modified father's custody of the Child—from unmonitored custody alternating every two days to monitored visits, three times a week for two hours each (the temporary order). The court issued the temporary order over the "vehement[]" objection of father. The court refused to allow father to present testimony during the hearing from an individual he claimed would debunk the road rage allegations, but informed father it "will allow for rebuttal with respect to this, including allowing [father] to testify, or any other witness that he has, at our next hearing . . . ." The court also advised father that principles of collateral estoppel might preclude him from relitigating "some of the issues that are set forth in the transcript" from the family court's hearing on the "road rage" restraining order.

1. *THE COURT SUMMARILY DENIES THE SECOND SECTION 388 PETITION BUT LEAVES THE TEMPORARY ORDER CHANGING FATHER'S CUSTODY IN PLACE*

On October 14, 2014, the court summarily denied the second section 338 petition, stating that it was "not going to even engage in argument on this issue" and, instead, it terminated jurisdiction, but stayed the termination order "so that [mother] can go to family court and request a modification of whatever visitation or custody orders she deems appropriate based upon the evidence that she wishes to present." Although the court summarily denied the second section 388 petition, the court ruled that the temporary order "will remain" until mother takes action in the family court to modify

8

custody and visitation. In order to ensure that there was no delay in addressing this issue, the court set a hearing to receive proof that there had been a "filing in family court and/or a hearing." The court explained that the family court "will determine whether or not the current visitation order [i.e., the temporary order] or the . . . shared custody and visitation orders of the court set out at disposition will remain or will be modified." Father "strenuously" objected to the court making its ruling without allowing him to present witnesses and legal argument.[6]

On the following day, October 22, 2014, mother filed a request for a modification of child custody and visitation in the family law proceeding.

### 2. *THE COURT DENIES FATHER'S MOTION FOR RECONSIDERATION*

Also on October 22, 2014, father filed a walk-on request asking the juvenile court to reinstate a "50/50" shared custody arrangement with unmonitored visitation. In support of his request, father, among other things, listed the evidence and witnesses he had planned to present at the October 14, 2014 hearing to rebut the second section 388 petition.

On October 23, 2014, the court conducted a hearing on father's walk-on request, which it deemed to be a motion for reconsideration.[7] The court acknowledged that it had never "addressed [the second section] 388 petition, which requested the change in visitation or custody." The court further acknowledged that it may have made an "error of law" by effectively removing custody of the Child from father without a hearing, and that it had "serious concerns" that the "temporary order pending a 388" may not have been a "legal order." The court stated that, in its view, in order to prevail on her second

---

[6] In preparation for the hearing on October 14, father submitted to the court a list of 24 expert and percipient witnesses that he planned to call in opposition to the second section 388 petition (only two of the 24 witnesses, the maternal grandparents, had testified in the family court proceeding), a list of exhibits he planned to use, and a legal memorandum addressing any collateral estoppel effects from the family court proceedings on the alleged road rage incident.

[7] On October 24, 2014, father filed a formal motion for reconsideration of the court's October 14, 2014 orders.

9

section 388 petition, mother had the burden of establishing by clear and convincing evidence that a change in custody was appropriate; the court went on to suggest that mother could not meet that burden, noting that, based on DCFS's reports, no safety concerns could be identified with respect to father, and that there was no evidence that the road rage incident adversely affected the Child.[8] The court then offered mother a choice if the court granted father's motion for reconsideration: either pursue the second section 388 petition and run the risk that she would not prevail based on the evidence; or go litigate the case in family court where "it belongs." The court then took the matter under submission, in part, to await mother's decision about how she would like to proceed.

As the court later explained in its October 28, 2014 written findings and orders, mother "opted for the latter" course—that is, litigating the issue of custody and visitation in the family court thereby effectively withdrawing the second section 388 petition. Because mother withdrew her petition, the court made "no factual findings regarding the allegations set forth in mother's [section] 388 petition."

Although mother withdrew her second section 388 petition and no factual findings were purportedly made with regard to that petition, the court did not return the parties to the status quo ante. Instead, it re-affirmed that its decision to terminate jurisdiction by lifting the stay. In addition, it issued a new "interim" order that would remain in effect until the family court had a chance to rule on mother's pending motion for a modification of custody and visitation. This interim order restricted father's custody and visitation to two days a week (Tuesdays and Thursdays) from noon until 6:00 p.m. (the interim order). So, instead of having 48 uninterrupted and unmonitored hours with his Child every two

---

[8] At the October 23, 2014 hearing, DCFS stated that it had no objection to the "prior custody arrangement," but requested an order that father not drive the Child in his car based on the road rage incident and that he participate in an anger management class. At the same hearing, counsel for the Child expressed "serious concerns" about the father's regard for his child's safety as a result of the road rage incident, but stated it would defer to mother's decision about whether to litigate her second section 338 petition or proceed to the family court.

days as provided in the dispositional order, father would have a total of only 12 unmonitored hours per week.

In addition, although the court stated that it was not making any factual findings on the second section 388 petition (which was premised principally on the alleged road rage incident), the court included as part of the interim order a prohibition on father driving the Child in a car until after the family court had n opportunity to rule on mother's pending motion. As with the temporary order, the court issued the interim order without affording father a chance to address the alleged facts that give rise to the order— the alleged road rage incident and the second section 388 petition.

Father filed a timely notice of appeal on December 24, 2014, challenging the court's termination of jurisdiction and modification of his custody and visitation rights without a hearing on both October 14, 2014 and again on October 28, 2014.

## V.     The family court gradually restores some of father's visitation rights[9]

On March 20, 2015, the family court issued an order increasing father's custody and visitation. Father would have "every Tuesday, Thursday and Friday from 10:30 a.m. to 6:00 p.m. for visitation with [the Child]." On April 21, 2015, the family court added another day to father's custody and visitation schedule—in addition to the days mentioned above, father will "have visitation with the minor child Sundays from 2:00 p.m. to 6:00 p.m." On June 12, 2015, the family court further increased father's visitation: Father's visitation on Sundays would go from 10:30 a.m. to 6:00 p.m.; and the Thursday visit would become an overnight visit, from Thursday at 10:30 a.m. to Friday at 6:00 p.m. In addition, more than a year after the alleged road rage incident occurred, the family court removed the prohibition on father driving the Child in his car.

---

[9] The following discussion is based on documents from the family law proceeding that mother requested we take judicial notice of pursuant to Evidence Code section 452 and 453. We granted mother's request on March 21, 2016.

11

In other words, it took nine months from the filing of the second section 388 petition for the visitation rights that father enjoyed before that filing to be approximately restored to him.

## DISCUSSION

### I. Mother's motion to dismiss is denied

Mother moves to dismiss the appeal, contending that the appeal is infirm for two reasons. First, mother argues that because the interim order is precisely that—a nonpermanent, contingent order—it is a nonappealable order. Second, mother argues in the alternative that even if father has standing to appeal, his appeal has been rendered moot by the family court's subsequent orders. We are unpersuaded by mother's arguments and deny her motion to dismiss.

#### A. *The temporary and interim orders are appealable*

The right to appeal, as mother correctly notes, is "strictly statutory, a judgment or order is not appealable unless a statute expressly makes it appealable." (*In re Michael H.* (2014) 229 Cal.App.4th 1366, 1373.) Because juvenile dependency proceedings are of an "ongoing nature and often result in multiple appealable orders" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 879), the Legislature endowed the dependency statutes with great liberality with regard to the right to appeal. For example, section 395, in pertinent part, provides that "[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and *any* subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1), italics added; see *In re S.B.* (2009) 46 Cal.4th 529, 532 ["[t]he dispositional order is the 'judgment' referred to in section 395"].) In addition, section 302, in pertinent part, provides as follows: "*Any* custody or visitation order issued by the juvenile court at the time the juvenile court terminates its jurisdiction pursuant to Section 362.4 regarding a child who has been previously adjudged to be a dependent child of the juvenile court shall be a final

judgment and shall remain in effect after that jurisdiction is terminated." (§ 302, subd. (d), italics added.)[10]

In short, "the general rule in juvenile dependency cases is that *all* orders (except for an order setting a section 366.26 hearing), starting chronologically with the dispositional order, are appealable *without limitation*." (*In re Gabriel G*. (2005) 134 Cal.App.4th 1428, 1435, first italics added; see *In re T.W*. (2011) 197 Cal.App.4th 723, 729 ["[t]he first appealable order in a dependency case is the dispositional order"].)

Here, the juvenile court issued the custody and visitation orders at issue—the October 14 temporary order and the October 28 interim order—seven months after the dispositional order. As the temporary and interim orders are post-disposition orders, they are, under the express terms of section 395, appealable orders.[11]

### B.   *The appeal is not moot*

As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. (*In re Michelle M*.

---

[10] Section 362.4 provides that when the juvenile court terminates jurisdiction over a minor child and a family law case is pending, the juvenile court's custody and visitation orders shall become part of the family law file.

[11] Mother's reliance of *Montenegro v. Diaz* (2001) 26 Cal.4th 249, is misplaced for several reasons. First, and perhaps most importantly, the case involves an appeal from the family court, not the juvenile court. (*Id*. at p. 252.) The juvenile court is a superior court of special jurisdiction arising from the juvenile court law. Dependency proceedings are governed by the Welfare and Institutions Code, rather than the Civil Code or the Family Code. (*In re Chantal S*. (1996) 13 Cal.4th 196, 200, 205–206.) "Statutes that are not a part of the Welfare and Institutions Code do not apply to juvenile court proceedings unless they are expressly applicable." (*In re Alexandria M*. (2007) 156 Cal.App.4th 1088 1098.) Second, even if a family court opinion could be applicable, the temporary custody orders at issue in *Montenegro v. Diaz* were, unlike here, stipulated orders agreed to by the parents. (*Id*. at pp. 252–253.) Third, even though neither of the orders at issue in *Montenegro v. Diaz* "contained a clear affirmative indication that the parties intended it to be a final judgment" (*id*. at p. 259), neither the Court of Appeal nor the Supreme Court refused to review the appeal on grounds of nonappealability; in fact both appellate courts ruled (albeit differently) on the merits of the appeal from the temporary orders at issue. (See *id*. at pp. 252, 254.)

(1992) 8 Cal.App.4th 326, 330.) However, dismissal for mootness in such circumstances is not automatic, but "must be decided on a case-by-case basis." (*In re Kristin B*. (1986) 187 Cal.App.3d 596, 605; see *In re Hirenia C*. (1993) 18 Cal.App.4th 504, 517–518.)

An issue is not moot if the purported error infects the outcome of subsequent proceedings. (*In re Joshua C*. (1994) 24 Cal.App.4th 1544, 1548.) For example, in *In re Dylan T*. (1998) 65 Cal.App.4th 765, the Court of Appeal concluded that the erroneous denial of visitation to an incarcerated parent jeopardized the parent's interests in subsequent proceedings and declined to dismiss the appeal as moot, even though the parent was no longer incarcerated. (*Id*. at pp. 769–770.) Similarly in *In re A.R*. (2009) 170 Cal.App.4th 733, the Court of Appeal declined to find moot a service member's appeal of a court's refusal to stay a dependency proceeding even though jurisdiction had terminated, because his rights had been adversely affected by award of sole custody to mother. (*Id*. at p. 740.)

Here, the juvenile court's temporary and interim orders adversely affected father's visitation rights. In addition, the interim order, arguably, continues to affect adversely those rights. The visitation rights that father now enjoys as a result of various orders by the family court are not identical to the rights he enjoyed prior to mother's filing of the second section 388 petition and the juvenile court's subsequent orders. Moreover, the visitation rights father now enjoys are, arguably, less than under the juvenile court's dispositional order. Under the dispositional order, father enjoyed more than two overnight visits per week; under the visitation regime established by the family court, father has only one such visit per week. In order to have more than one overnight visit per week, father will need to establish that such a change is in the best interests of the Child. (See *In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1076–1079.) In other words, the purported error at issue here has infected and continues to infect subsequent proceedings. Even if father's current visitation rights were not different or less than what he enjoyed under the dispositional order, we would still consider the merits of the appeal for the sake of procedural fairness and due process. We would do so "because dismissal

of the appeal operates as an affirmance of the underlying judgment or order." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1489.)

## II. Governing legal principles and standard of review

Under section 388, a parent may petition to change or set aside a prior order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1); see Cal. Rules of Court, rule 5.570(a).) The juvenile court "shall" order a hearing where "it appears that the best interests of the child . . . may be promoted" by the new order. (§ 388, subd. (d).) As a result, the parent "must sufficiently allege both a change in circumstances or new evidence and the promotion of the child's best interests." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.) "Section 388 thus gives the court two choices: (1) summarily deny the petition or (2) hold a hearing." (*In re Lesly G.*, *supra*, 162 Cal.App.4th at p. 912.)

In order to avoid summary denial, the petitioner must make a "'prima facie'" showing of "facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) In order to make a prima facie, the petitioner must show either (1) a change of circumstances or new evidence requiring a changed order, or (2) that the relief requested would promote the best interests of the child. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189; Cal. Rules of Court, rule 5.570(d).) "A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause." (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1157.)

"In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Justice P.*, *supra*, 123 Cal.App.4th at p. 189.) "'[I]f the petition presents *any* evidence that a hearing would promote the best interests of the child,'" the court should order a hearing. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415, italics added.) In short, "the petition must be liberally construed in favor of its sufficiency." (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1157; Cal. Rules of Court, rule 5.570(a).)

15

If the petition makes the necessary showing, rule 5.570(h) of the California Rules of Court governs the conduct of the hearing. Rule 5.570(h) provides, among other things, that if the petition seeks to "modify any orders related to custody or visitation of the child . . . the petitioner must show by clear and convincing evidence that the proposed change is in the best interests of the child." (Cal. Rules of Court, rule 5.570(h)(C).) "The hearing must be conducted as a disposition hearing under rules 5.690 and 5.695 if[] [¶] . . . [¶] . . . There is a due process right to confront and cross-examine witnesses. [¶] Otherwise, proof may be by declaration and other documentary evidence, or by testimony, or both, at the discretion of the court." (Cal. Rules of Court, rule 5.570(h)(E)(2).)

*In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, illustrates the operation of these principles. In that case, the court placed custody of the children with their paternal uncle in 2005 due to "unstable, explosive and irrational behavior" by the father. (*Id.* at p. 1356.) In 2006, the uncle had to secure a restraining order against the father. (*Ibid.*) In 2007, the father filed a section 388 petition seeking, inter alia, unsupervised visitation as arranged between the uncle and him. (*Ibid.*) The court found the best interests of the children might be promoted by the requested new order and that the petition stated a change of circumstance or new evidence; accordingly, the court set a hearing on the petition. After several continuances, the court held a hearing. (*Id.* at p. 1357.) However, at the hearing, "the court did not review the sufficiency of the petition; rather it dismissed the petition without holding a hearing." (*Id.* at p. 1359.) Father appealed and the Court of Appeal reversed, holding that "[w]hen the court has determined the petition states a prima facie case, it is *required* to hold an evidentiary hearing." (*Ibid.*, italics added.) The Court of Appeal reversed and remanded to the juvenile court with directions to hold an evidentiary hearing on father's request to modify the prior visitation order. (*Id.* at p. 1360.)

Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse

of discretion. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318; *In re G.B.*, *supra*, 227 Cal.App.4th at p. 1157.)

**III.    The trial court abused its discretion by substantially modifying father's custody without a hearing**

*A.        The court improperly short-circuited the section 338 review process*

As discussed above, the section 338 review process must proceed in several distinct stages. As discussed below, the juvenile court did not comply with that mandated process, but instead truncated or short-circuited the process.

As a preliminary matter, there is the determination by the court whether the petition has made the required prima facie showing. Although the court below did not expressly say on September 29, 2014, that the second section 338 petition had made the required showing, the court indicated that the petition had in fact done so by its actions.

First, the only problem the court identified with respect to the second section 338 petition was that the documents supporting the petition (a transcript and order from the family court) were not properly authenticated. The record on appeal shows that this issue was seemingly corrected by the submission, on or about October 3, 2014, of certified copies of (a) the complete transcript of the hearing on September 3, 2014 and (b) the family court's minute order from that same date.

Second, the court issued the temporary order, which significantly reduced father's visitation rights—going from unmonitored custody alternating every two days to monitored visits, three times a week for two hours each. The temporary order was in response to the "troubling and concerning issues" established by the petition.

Third, although the court did not allow father to present testimony during the hearing on September 29 from an individual father claimed would debunk the road rage allegations, the court informed father that it "will allow for rebuttal with respect to this, including allowing [father] to testify, or any other witness that he has, at our next hearing . . . ."

Having effectively determined that the second section 338 petition process met the threshold requirement of making a prima facie case for a modification in visitation, the

17

court was then obligated to hold a hearing on the matter. However, the court did not hold a hearing. Instead, on October 14, it partially backtracked—summarily denying the petition without any argument, but allowing the temporary order to remain in effect without ever allowing father to challenge the factual basis for that order, namely the petition's averments about the alleged road rage incident.

On October 23, at the third hearing on mother's petition, the court reversed itself again on two different issues. First, the court acknowledged that the temporary order was of doubtful legality. Second, the court indicated that the second section 388 petition had met its prima facie burden, but—without hearing any evidence or argument from either mother or father on the merits—concluded that mother would not be able to meet her evidentiary burden of showing by clear and convincing evidence that the proposed change was in the best interests of the Child.

Although mother ultimately elected to withdraw an apparently legally sufficient section 338 petition, the court proceeded to issue an order that was premised on facts in that petition, namely the alleged road rage incident. In its interim order, the court not only reduced father's visitation rights from those granted to him by the dispositional order, but also prohibited him from driving the Child. In short, the juvenile court abused its discretion by failing inexplicably to comply with the legislatively mandated procedure for resolving section 388 petitions.

*B. Alternatively, the court failed to comply with the section 362.4 review process*

Even if the interim order, which succeeded the temporary order, is construed as an order totally unrelated to the second section 338 petition—that is, an order made, pursuant to section 362.4, as part of the termination order—the failure of the court to hold a hearing on the change in father's visitation still constitutes an abuse of discretion.

*In re Michael W.* (1997) 54 Cal.App.4th 190, is illustrative. In that case, in August 1995, DCFS reported that the mother suffered from depression and had been hospitalized earlier that summer. (*Id.* at p. 193.) The mother was prescribed a variety of medications and received out-patient treatment. (*Ibid.*) In April 1996, by which time the

18

mother's condition apparently had improved, the juvenile court held a hearing to determine if it should terminate jurisdiction and refer the case to the family court for further proceedings. (*Ibid.*) The court denied the mother's request for an evidentiary hearing to establish her progress during recent counseling, awarded the father physical custody of Michael, with only monitored visits for the mother, and terminated jurisdiction. (*Ibid.*) A few days later, the mother again requested a hearing on the issue of visitation. (*Ibid.*) The juvenile court again refused to hold a hearing, finding that there was no "'change of circumstances,'" and that it was in Michael's best interests to continue with monitored visits until the mother's therapist could give an "'unconditional recommendation'" for unmonitored visits. (*Ibid.*) The juvenile court subsequently made its final order, granting the father physical and sole legal custody of Michael, with only monitored visits for the mother. (*Ibid.*)

The Court of Appeal held "'when making an order to be transferred to the family court, the juvenile court has the power to hear evidence relevant to that order under section 362.4.'" (*In re Michael W.*, *supra*, 54 Cal.App.4th at pp. 194–195.) The Court of Appeal reasoned, "a dependency court ought to accept all the help it can get before it makes an order affecting the lives of the children and parents who appear before it, and we *cannot* condone a deliberate decision to impose artificial restrictions on the parties' ability to bring relevant evidence to the attention of the court." (*Id.* at p. 196, italics added.) The Court of Appeal explained the "help" provided by an evidentiary hearing is important because any such order casts a long and prejudicial shadow: "[W]e presume some prejudice from the simple fact that a family court will naturally defer to a recent order of the dependency court concerning custody and visitation. . . . [Citations.] Since the orders made by a juvenile court at a section 364 hearing are necessarily made while dependency jurisdiction continues, it follows logically that a family . . . court would defer to those orders and hesitate to second-guess the juvenile court judge, at least absent something more than the ordinary showing of changed circumstances." (*Id.* at p. 196; *In re Chantal S.*, *supra*, 13 Cal.4th at p. 209 [a parent exiting dependency court brings considerable baggage to the family court].)

19

Other courts have reached similar conclusions. In *In re Roger S.* (1992) 4 Cal.App.4th 25, 31, the Court of Appeal held that the juvenile court erred in refusing to consider evidence which would have supported a more liberal visitation order for a father, because the court's power under section 362.4 required it to make an informed decision concerning the best interests of the child. Similarly, in *In re Hirenia C.*, *supra*, 18 Cal.App.4th at p. 520, the Court of Appeal stated that "it would likely be reversible error for the juvenile court to refuse to hear evidence which is relevant to the formulation of an appropriate 'exit' order regarding visitation."

Under section 362.4, the court is obligated to look to the best interests of the child under all circumstances. (*In re John W.* (1996) 41 Cal.App.4th 961, 973–974.) In addition, in making an exit order, the court must make an "*informed* decision." (*Id.* at 973, italics added.) Here, there is *nothing* in the record—no statements by the court in either the hearing transcript or in the written findings and orders—analyzing, let alone establishing, how the interim order was in the best interests of the Child. Nor could there have been, because the court refused to hear any evidence on the subject. By "closing its eyes" (*In re Roger S.*, *supra*, 4 Cal.App.4th at p. 30), the court deviated from the legislative blueprint for dependency cases. "Although both the family court and the juvenile court focus on the best interests of the child, the juvenile court has a special responsibility to the child as *parens patriae* and *must* look at the totality of the child's circumstances. . . . [citation] . . . [Citation.] By empowering the juvenile court to issue custody . . . orders, the Legislature has expressed its belief that 'the juvenile court is the appropriate place for these matters to be determined . . . .'" (*Id.* at pp. 30–31, second italics added.)

In short, whether the interim order is reviewed under section 388 or section 362.4, the trial court abused its discretion by making an order that significantly and adversely affected father's visitation rights with his daughter without the benefit of an evidentiary hearing. The adverse impact of that order lasted for nine months—a significant period of time for a young child and her parent.

*C.* *The court's legitimate concerns over judicial economy did not allow it to short-circuit the review process inherent under either section 388 or section 362.4*

The legal contortions that the juvenile court put itself and the parties through were not entered into mindlessly. Rather, the court drew motivation from a very real and very legitimate concern: "the strong public interest in preventing the juvenile dependency system from being used to subsidize private child custody disputes." (*In re John W.*, *supra*, 41 Cal.App.4th at p. 969.) In both its comments at the hearings and in its written findings and orders, the court repeatedly stressed that the dependency case was now at a point where the family court should take over—there were no safety concerns for the Child with respect to either parent and the court's time was increasingly taken up with matters that properly belonged to the family court.

The court's concern about the need not to prolong dependency jurisdiction when there is a parallel family court proceeding is well recognized. As the court in *In re John W.*, *supra*, 41 Cal.App.4th 961, advised: "The juvenile courts must not become a battleground by which family law war is waged by other means. It is common knowledge that the resources of local government social service agencies are stretched thin; in the juvenile dependency context those resources are manifestly intended to be directed at neglected and genuinely abused children." (*Id*. at p. 975.) The court further observed, "If indeed there is ever a place for it, the place for a custody battle is in the family . . . courts. There the battle will not consume public resources which are better directed to children who typically do not have the luxury of two functional parents fighting for custody, and where the taxpayers do not have to pick up the tab for lawyers and psychologists." (*Id*. at p. 976, fn. omitted.)[12]

---

[12] At the hearing on October 14 and in its written findings and orders, the court cites *In re A.G.* (2013) 220 Cal.App.4th 675, to explain and support its "judicial economy" reasoning for terminating the case. On the point of judicial economy and the respective roles of the juvenile and family courts, the court in *In re A.G.* relied principally on *In re John W.*, *supra*, 41 Cal.App.4th 961. (See *In re A.G.*, at p. 686.)

21

There is, however, another concern that a juvenile court must be sensitive to besides judicial economy: manipulation by the parents. As the court in *In re John W.*, *supra*, 41 Cal.App.4th 961, warned, there may be cases where the parents' resentment and distrust of each other, aided and abetted by well-meaning grandparents, may lead to a situation where the child is "seen more as trophy than human being." (*Id*. at p. 976) Accordingly, "[j]uvenile courts must be vigilant to prevent unsubstantiated allegations of monstrous behavior . . . from becoming a means of leverage in a custody fight . . . ." (*Id*. at pp. 975–976; accord, *In re Anne P*. (1988) 199 Cal.App.3d 183, 201 (conc. opn. of Brauer, J.) [sympathizing with falsely accused father].)

The strongest defense against such potential manipulation is the court's power to insist on the parties presenting evidence to back up their allegations. Here, the court did not exercise its power and that was an abuse of its discretion.

## IV. The trial court's error was not harmless

"While a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], parents in dependency proceedings 'are not entitled to full confrontation and cross-examination.' [Citation.] Due process requires a balance. [Citation.] The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.' [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court." (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146–1147.) If a due process violation occurred, we determine whether "the error was harmless beyond a reasonable doubt." (*In re Mark A*. (2007) 156 Cal.App.4th 1124, 1146.)

Here, the juvenile court issued two separate orders sharply restricting father's visitation rights. In each instance, the court based its order on the unchallenged allegations put forth by mother's second section 388 petition. In other words, father was not allowed to present any evidence relevant to mother's allegations about how the alleged road rage incident adversely affected the best interests of the Child such that a

change in visitation was warranted. The juvenile court's procedural errors in responding to the second section 388 petition were not harmless beyond a reasonable doubt. As discussed above, as a result of the interim order being issued without the benefit of a evidentiary hearing on the alleged road rage incident, it took father nine months from the filing of the second section 388 petition to reclaim an approximation of the visitation rights that he enjoyed prior to that filing.

## V.     Remand to family court is appropriate

The parties differ as to which court this matter should be remanded to if we hold, as we do, that a prejudicial abuse of discretion occurred. Father argues that the matter should be remanded back to the juvenile court, while mother contends that remand to the family court is proper given the length of time that has elapsed. On balance, we hold that mother has the better argument.

"While remand to a court different from the one which issued the judgment appealed from is, to say the least, unusual, such a result is necessarily inherent in section 362.4, which expressly contemplates future proceedings in the family courts. By providing that the exit order be filed in any dissolution case between the parents, the Legislature has demonstrated an intent that any future court proceedings in which custody is in issue be in the family court. When the merits of a section 362.4 exit order are at issue (as distinct from the validity of termination itself), the time lag inherent in the appellate process itself means that any remand must necessarily be directly to the family court. Who else is there when juvenile court jurisdiction has been correctly terminated?" (*In re John W.*, *supra*, 41 Cal.App.4th at pp. 976–977; *In re A.C.*, *supra*, 220 Cal.App.4th at pp. 686–687.)

Given that more than two years have elapsed since the alleged "road rage" incident and more than 18 months have passed since the temporary and interim orders were issued, and given that the family court has been repeatedly engaged in adjusting father's visitation, it seems only appropriate that the matter be remanded to the family court. Our decision in this regard is further reinforced by the fact that father's concern is not with the fact that dependency jurisdiction was terminated, but with the visitation

23

orders that accompanied the termination. In other words, father implicitly concedes that the juvenile court was correct in concluding that there was no risk to the Child which warranted continued dependency jurisdiction; father's only dispute is with the juvenile court's failure to give him an evidentiary hearing on mother's road rage allegations. Under such circumstances, remand to the family court, not the juvenile court, is appropriate. As our Supreme Court has explained, "The family court is established to provide parents a forum in which to resolve, inter alia, private issues relating to the custody of and visitation with children. . . . [Citation.] The juvenile court, by contrast, provides the state a forum to 'restrict parental behavior regarding children, . . . and . . . to remove children from the custody of their parents or guardians.'" (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 201.)

## DISPOSITION

As they pertain to custody and visitation, the October 14, 2014 temporary order and the October 28, 2014 interim order by the juvenile court are reversed. Orders issued by the family court regarding custody and visitation subsequent to the juvenile court's termination of jurisdiction stand. The matter is remanded to the family court for further proceedings consistent with our holding herein.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

24